IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TODD JOHNATHAN WHITEHEAD, # 287908,  )
                                       )
            Petitioner,                )
                                       )
       v.                              )       CIVIL ACTION NO.
                                       )         1:14cv329-MHT-SRW
LOUIS BOYD, *et al.*,          )       (WO)
                                       )
            Respondents.               )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This case is before the court on petitioner Todd Johnathan Whitehead's ("Whitehead")

claims amending his petition for writ of habeas corpus under 28 U.S.C. § 2254.  *See* Doc. Nos. 22,

23, and 34.  The district court previously entered a judgment denying relief on separate claims

which Whitehead asserted in his § 2254 petition before he was allowed to amend the petition.  *See*

Doc. Nos. 17, 25, and 26.  After judgment was entered on those claims, the district court referred

this case back to the undersigned for consideration of Whitehead's motion to amend his petition

to raise claims that he exhausted through a Rule 32 petition he filed in state court after filing his §

2254 petition in this court.  Doc. No. 26.  Whitehead's motion to amend has been granted (Doc.

No. 42), and the claims he raises in his amendment are now considered in this Recommendation.

## II.  BACKGROUND AND PROCEDURAL HISTORY

In January 2013, a Houston County jury found Whitehead guilty of one count of sexual

abuse in the first degree, in violation of § 13A-6-66, Ala. Code 1975; three counts of incest, in

violation of § 13A-13-3, Ala. Code 1975; three counts of rape in the second degree, in violation

of § 13A-6-62, Ala. Code 1975; and two counts of rape in the first degree, in violation of § 13A-

6-61, Ala. Code 1975. On February 11, 2014, the trial court sentenced Whitehead to 10 years' imprisonment on the sexual abuse conviction, 10 years' imprisonment on each of the three incest convictions, 20 years' imprisonment on each of the three second degree rape convictions, and 99 years' imprisonment on each of the two convictions for first degree rape. The sentences were ordered to run consecutively.

Whitehead appealed, and on October 25, 2013, by unpublished memorandum opinion, the Alabama Court of Criminal Appeals affirmed his convictions and sentence. Doc. No. 14-9. In that memorandum opinion, the Alabama Court of Criminal Appeals summarized the evidence admitted at trial:

> The evidence adduced at trial indicated the following. Starting when she was 6 years old and ending when she was 16 years old, R.R. was repeatedly sexually abused and raped by her stepfather, Whitehead. R.R. testified that when she was 6 years old Whitehead began touching her in the genital area and fondling her. He would also make her touch him in the genital area. R.R. testified that Whitehead treated her differently from the other children in the household. Specifically, R.R. testified that her punishment always included something sexual in nature, whereas the other children were spanked or grounded. R.R. stated that she always did what Whitehead commanded her to do because she had no choice; she stated that it was "his way or the highway." (R. 156.) Whitehead would also make comments about how R.R. had a "perfect body." (R. 155.)

> When R.R. was 13 years old, her family moved to a home on Bill Yance Road. R.R. testified that the day they moved to the new house was the first day the sexual contact by Whitehead went from touching to penetration of her vagina. That day, Whitehead sent R.R.'s mother and siblings to the old house to retrieve more items so that he and R.R. could be alone at the house. Whitehead told R.R. to come to the bedroom with him where he demanded that R.R. take off her clothes and lie down on a red towel. Whitehead got down on the floor and stuck his penis inside R.R.'s vagina. R.R. saw Whitehead's penis and felt it as well. While this was occurring, R.R. begged and screamed for Whitehead to stop, but he would not. R.R. also tried to get away, but Whitehead was too big and she could not get up. R.R. testified that she was scared of Whitehead because he had physically beaten her with a boat paddle in the past.

> A few days later, Whitehead again told R.R. to follow her into his bedroom. He then told her to lie down on the floor and penetrated her vagina with his penis. After these first two incidents, Whitehead would penetrate R.R.'s vagina with his

hands or penis almost every day. Generally, these events happened at night after R.R.'s mother went to work. R.R. also testified that Whitehead sometimes made excuses so that he could be alone with her. On several occasions, he lied about her having doctor appointments so she could miss school. He would then take her in his car to a secluded area and engage in sexual contact with R.R.

Whitehead told R.R. that R.R. would "go to jail for even giving in to do it or he would kill [R.R.] or [R.R.] would regret it really, really bad" if she told her mother what was happening to her. (R. 169.) Whitehead further said that if R.R. told anybody, he would ruin her life and that nobody would ever believe her. He also told R.R. that he chose her for these sexual acts because she was prettier than her sisters. He told R.R. that her mother did not make him happy and that she did not satisfy him sexually. He only stayed with R.R.'s mother because of R.R. Whitehead told R.R. that he couldn't get her pregnant because of his physical problems.

Whitehead also threatened to beat R.R. with a boat paddle when she refused his sexual advances. Because Whitehead was the main disciplinarian in the household, R.R. was afraid of him.

On R.R.'s 15th birthday, Whitehead told her to put on her mother's lingerie and they had intercourse. On Whitehead's birthday, he told R.R. that all he wanted for his birthday was for her to perform oral sex on him. R.R. did as Whitehead demanded and afterwards he penetrated R.R. with his penis. Afterwards, Whitehead told her to put her clothes on and not to say anything about it.

On another occasion, Whitehead presented R.R. with a pink vibrator and sex dice. He instructed her to hide these in a sock underneath the entertainment center in her room so that R.R.'s mother would not find them. He also had a second vibrator in his room that he used on R.R. while performing oral sex on her. R.R. testified that sometime in 2009 Whitehead bought a racing game that had a dancing girl in it. Whitehead made R.R. get up and dance naked while he played the game. While she danced, he touched her private area and penetrated her with his finger. After she was done dancing, he penetrated her with his penis.

In addition to the racing game, Whitehead would also watch pornographic movies with R.R. While the movies played, Whitehead made R.R. lie on the bed naked while he fondled her genital area. Whitehead then inserted his penis into R.R.'s vagina. Whitehead would sometimes offer R.R. money or anything she wanted from the store in exchange for sexual acts.

In August 2010, R.R.'s mother went to California. R.R.'s sister went to stay with a friend. R.R. testified that she knew something would happen because the two of them were alone at the house. When her sister left, R.R. and Whitehead went to the store. R.R. sat in the car while Whitehead entered the store. When he returned to the car, he was carrying a rose. They drove back to the house and R.R. went to

her bedroom. Whitehead came to the room, offered her alcohol, and gave her a card along with the rose. At the top of the card appeared the words "Lover, soulmate, object of my affections, sweetheart, light of my life, darling, mon amour, and true love." (R. 218.) On the inside of the card was a picture of a rose and the printed words "Nobody loves you like I do." (C. 231.) There was also a handwritten statement which read:

> "I really mean this. No one will love you like I do. I know that we can't marry and be together forever, but I will always be here for you. And you can always come to me for anything. You are a huge part of my heart and a most important part of my happiness. I absolutely don't want to lose you. So much so that I am willing to share you with whoever you end up with. I will always cherish what we have shared and I hope to share more with you in the future. But if u [sic] decide not to have me in your life in a romantic personal way, I will be sad but I will deal with it. Please try to trust me and allow me back in your life as at least of all a good friend, and I hope, more than just a friend, but at the least as a close friend. I love you!! Always and forever. You haven't completely lost my trust and love. Ok!! Don't throw away the good we have shared, I won't throw it away!!"

(C. 231.)

Whitehead became angry that R.R. was not happy with the card and told her to follow him. Instead, R.R. ran away from Whitehead and met with her neighbor, Mama McKee. R.R. and McKee then drove to Wal-Mart together to meet with Lieutenant Randy Anderson. R.R. knew Lt. Anderson from the DARE program at her school. At Lt. Anderson's suggestion, McKee and R.R. drove to the sheriff's department and met with an investigator. Lieutenant Bill Rafferty was a sergeant at the Sex Crimes Unit of the Houston County Sheriff's Department. Lt. Rafferty interviewed R.R. after she arrived at the station. He testified that R.R. was initially shy and only disclosed that Whitehead had been touching her for a while.

Later, Lt. Rafferty interviewed Whitehead. During the interview, Whitehead admitted that he had written the romantic card for R.R. He further admitted that he had feelings for R.R. and wanted to be with her romantically. Whitehead told Lt. Rafferty that he was hoping to marry R.R. when she turned 18 years old.

On August 20, 2010, a sexual-assault examination was performed on R.R. at Flowers Hospital. Susan Marsh, the Sexual Assault Nurse Examiner ("SANE"), testified that she conducted a SANE exam on R.R. Marsh testified that R.R.'s hymen was thinned and indicated that R.R. had been penetrated more than one time.

Doc. No. 14-9 at 2–5 (page references from record on direct appeal).

Whitehead's application for rehearing was overruled by the Alabama Court of Criminal Appeals on November 15, 2013. Doc. Nos. 14-10 and 14-11. He then filed a petition for writ of certiorari with the Alabama Supreme Court, which that court denied on January 10, 2014, issuing a certificate of judgment the same day. Doc. Nos. 14-12, 14-13, and 14-14.

On March 27, 2014, Whitehead, proceeding *pro se*, filed a § 2254 petition in this court asserting two claims he had raised on direct appeal in state court: (1) that the trial court erred in failing to excuse three prospective jurors for cause, and (2) that the State failed to present sufficient corroborating evidence to support his incest convictions.[1] Doc. No. 1 at 6 and 8. This court ultimately determined that the state court correctly denied Whitehead relief on these claims and that the claims did not entitle Whitehead to federal habeas relief. *See* Doc. Nos. 17, 25, and 26.

Around September 24, 2014, while his § 2254 petition was pending in this court, Whitehead filed a *pro se* petition in the state trial court seeking relief under Rule 32 of the Alabama Rules of Criminal Procedure. *See* Doc. No. 39-1 at 21–176. In his Rule 32 petition, Whitehead claimed his trial counsel, Billy Joe Sheffield, rendered ineffective assistance by: (1) denying him his right to testify in his own behalf; (2) "failing to call, secure, or subpoena witnesses who were readily available to testify as first-hand witnesses by providing alibi testimony of Whitehead's innocence"; (3) "failing to introduce reliable exculpatory evidence that was crucial to the defense of Whitehead"; (4) "fail[ing] to object to the trial court's ex parte communications with the jury by providing the jury with supplemental instructions outside the presence of [the parties] and the court reporter"; (5) "failing to object to the trial court's failure to rule on over thirty objections posed by [his] trial counsel and the prosecution"; and (6) "failing to impeach the State's key

---

[1] Whitehead initially filed the § 2254 petition in the United States District Court for the Southern District of Alabama. In an order entered on May 5, 2014, that court transferred Whitehead's petition to this court. *See* Doc. Nos. 3 and 4.

witness, [R.R.], with exculpatory evidence that was provided by other State witnesses in their testimony, Whitehead's VA medical records, and other defense witnesses who were readily available to testify." Doc. No. 39-1 at 44.

Without requiring a response from the State, the trial court entered an order on January 7, 2015, summarily dismissing Whitehead's Rule 32 petition with respect to each of his claims except his allegation that his trial counsel, Sheffield, prevented him from testifying at trial.[2] Doc. No. 39-1 at 29. The trial court set an evidentiary hearing on this remaining claim. *Id.* The hearing was held on March 16, 2015. Doc. No. 39-2 at 118–170. On March 30, 2015, the trial court entered an order denying Whitehead's Rule 32 petition regarding his claim that Sheffield was ineffective for allegedly preventing him from testifying. *Id.* at 93.

Whitehead appealed to the Alabama Court of Criminal Appeals, where he reasserted his Rule 32 claims, except for his claim that Sheffield was ineffective for failing to impeach the victim, R.R., with exculpatory evidence provided by other State witnesses in their testimony, Whitehead's VA medical records, and other defense witnesses allegedly available to testify.[3] On January 8, 2016, by unpublished memorandum opinion, the Alabama Court of Criminal Appeals affirmed the trial court's judgment denying Whitehead's Rule 32 petition. Doc. No. 37-1. Whitehead applied for rehearing, which was overruled. *See* Doc. No. 39-5. He then filed a petition for writ of certiorari with the Alabama Supreme Court, which that court denied on May 13, 2016, issuing a certificate of judgment the same day. Doc. Nos. 39-6 and 39-7.

---

[2] With respect to the dismissed Rule 32 claims, the trial court's order essentially found that the claims were without merit. Doc. No. 39-1 at 2.

[3] Accordingly, the Alabama Court of Criminal Appeals deemed the particular issue to be waived on appeal. *See* Doc. No. 37-1 at 7 n.1.

Whitehead is now before this court, through the amendment to his § 2254 petition, with the claims he pursued in appealing the denial of his Rule 32 petition. Specifically, those claims are that Sheffield rendered ineffective assistance of counsel at trial by:

(1) denying him his right to testify at trial;

(2) failing to call, secure, or subpoena witnesses available to provide alibi testimony;

(3) "failing to introduce reliable exculpatory evidence that was crucial to [his] defense";

(4) failing to object to the trial court's "ex parte communications with the jury"; and

(5) failing to object to the trial court's failure to rule on numerous objections posed by defense counsel and the prosecutor.

Doc. No. 14-7 at 45.

The respondents argue that Whitehead's claims were properly adjudicated on the merits by the state courts and that Whitehead is therefore not entitled to federal habeas relief on the claims asserted in his amendment. After careful review of Whitehead's claims, the undersigned finds, for the reasons set forth below, that Whitehead is not entitled to relief and recommends that his § 2254 petition be denied and this case be dismissed with prejudice.

## III. DISCUSSION

### A. Habeas Review of Claims Adjudicated on Merits by State Court

"When it enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress significantly limited the circumstances under which a habeas petitioner may obtain relief." *Hardy v. Allen*, 2010 WL 9447204, at *7 (N.D. Ala. Sep. 21, 2010). To prevail on a § 2254 claim adjudicated on the merits by the state courts, a petitioner must show that a decision by the state courts was "contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts, in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(1) and (2); *see Williams v. Taylor*, 529 U.S. 362, 404–05 and 412–13 (2000).

A state court's decision is "contrary to" federal law either if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts "materially indistinguishable" from those in a controlling case, but nonetheless reaches a different result. *Williams*, 529 U.S. at 404–06; *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court's decision is an "unreasonable application" of federal law if it either correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or it extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable. *Williams*, 529 U.S. at 407.

"Objectively unreasonable" means something more than an "erroneous" or "incorrect" application of clearly established law, and a reviewing federal court may not substitute its judgment for the state court's even if the federal court, in its own independent judgment, disagrees with the state court's decision. *See Williams*, 529 U.S. at 411; *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). The reviewing court "must determine what arguments or theories supported or ... could have supported[ ] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "This is a 'difficult to meet,' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 536 U.S. 170, 181 (2011) (internal citations omitted).

Federal courts are likewise directed to determine whether the state court based its findings on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). A state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## B. Ineffective Assistance of Counsel

*Strickland v. Washington*, 466 U.S. 668 (1984), sets forth the clearly established federal law on claims of ineffective assistance of counsel and requires that a petitioner alleging ineffective assistance establish that his counsel's performance was deficient and that he was actually prejudiced by the inadequate performance. 466 U.S. at 687. This requires showing both that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. The petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

An ineffective assistance of counsel claim is examined under the "totality of the circumstances." *House v. Balkcom*, 725 F.2d 608, 615 (11th Cir.1984). An attorney's performance is presumed to have been reasonable and must not be examined with the aid of judicial hindsight. *Messer v. Kemp*, 760 F.2d 1080, 1088 (11th Cir. 1985). A federal court must apply a "heavy measure of deference to counsel's judgments." *Singleton v. Thigpen,* 847 F.2d 668, 670 (11th Cir. 1988) (quoting *Strickland,* 446 U.S. at 691).

### 1. *Denial of Right to Testify*

9

Whitehead claims that his trial counsel, Billy Joe Sheffield, rendered ineffective assistance of counsel by denying him his right to testify at trial. *See* Doc. No. 22 at 7–8; Doc. No. 23 at 4 and 11; Doc. No. 34 at 2–3.

This claim, raised in Whitehead's Rule 32 petition, was the subject of an evidentiary hearing before the trial court. Testifying at the hearing were Whitehead, his wife, Sheffield, and Brenda Dickey, a paralegal in Sheffield's law office. The Alabama Court of Criminal Appeals' memorandum opinion in Whitehead's Rule 32 appeal summarized the testimony presented:[4]

> R.W. [Whitehead's wife], testified on T.J.W. [Whitehead]'s behalf. R.W. testified that she had accompanied T.J.W. to his trial counsel's office on several occasions and that T.J.W. had spoken with his trial counsel, Billy Joe Sheffield, and Sheffield's paralegal, Brenda Dickey, regarding T.J.W.'s desire to testify at trial. [In response to questioning by Whitehead,] R.W. stated, "All I can say is you [Whitehead] wanted to be on the stand, and Mr. Sheffield said that you were too— I think he used the word emotionally involved." (R. 11.) R.W. testified that Sheffield informed T.J.W. that it was ultimately T.J.W.'s decision whether to testify at trial but that he advised T.J.W. that it would not be wise to do so.
>
> Sheffield testified that he had been practicing law for "probably over 12 years" and that T.J.W. and R.W. met with him at his office "up to 50 or more times." (R. 20, 24.) Sheffield testified that he was concerned with T.J.W.'s lack of a logical explanation for writing the love letter to R.R. as well as the fact that T.J.W. had an outstanding warrant in Georgia. [In response to questioning by Whitehead,] Sheffield testified:
>
>> "A. I told you [Whitehead] that from me doing numerous sex cases, that the best chance for you to win would be for you to take the witness stand unless [the prosecutor] messed up in court and played your so-called confession statement in court. That you had to get up before the jury and you had to tell them why you did that. And if you couldn't do that, then you were in trouble.
>>
>> "[Whitehead]. Right. So, every time that I came to your office and was adamant about I needed to be on the stand—

[4] In its memorandum opinion, the Alabama Court of Criminal Appeals identified Whitehead as "T.J.W." and identified Whitehead's wife, Regina, as "R.W." The victim was identified as "R.R." Whitehead represented himself at the hearing and, in addition to testifying himself, he questioned and cross-examined the other testifying witnesses.

"A. You were never adamant. Matter of fact, I was the one that was adamant. And I think your exact phrase on why you wrote the letter was you have to handle the young lady in a certain way. You had to—and I asked you what that meant. And you said, 'Well, you've got to have'—I think kid gloves was what you said. And I told you that did not come across very good in a sex case.

"....

"And, you know, you just didn't do very well in my questioning. And I told you that I had grave concerns if you didn't get it together and come up with a why question—or answer.

"[Whitehead]. So, those concerns were the reason why you did not call me to the stand to testify?

"A. No. *The reason I didn't call you to the stand is because, when the State rested, I asked you if you wanted to testify, and you told me, no, you thought it was going good, right there at that table you're sitting at and, I believe, out there in the hallway.*

"[Whitehead]. Do you agree that it is my choice and my choice alone whether or not to testify in my own behalf?

"A. Absolutely."

(R. 24–28; emphasis added.)

On cross-examination, Sheffield clarified that he told T.J.W. "that he was too emotional that day and he needed to calm down, but not that he was too emotionally involved." (R. 30.) Sheffield explained that he made that statement to T.J.W. after a meeting during which his other daughter "had a meltdown and didn't want to testify" after reading the love letter T.J.W. had given to R.R. "because she thought [T.J.W.] was guilty after that." (R. 29.) Sheffield testified that he told T.J.W., "'[T]hat's how the jury would perceive that, and you need to come up with an explanation of how you're going to explain that to someone like her and the jury.' And that's the day he got really emotional." (C. 29.)

T.J.W. testified that he and Sheffield "got into heated discussions about [T.J.W.] testifying" every time he met with Sheffield and that T.J.W. was "very adamant ... that [he] needed to testify." (R. 37.) T.J.W. stated, "Sheffield was constantly saying, '[T.J.W.], you're not going to do very well on the stand. I feel that, you know, if you can't do better, you're just going to hurt yourself. You're just going to shoot yourself in the foot. The jury is going to find you guilty. You need to do better.'"

(R. 37.) T.J.W. wanted to testify about his medical records that would have shown that he has been diagnosed with a sexual dysfunction that prevented him from committing the crimes for which he was convicted. T.J.W. also wanted to testify about what, he said, were falsehoods in R.R.'s testimony, but, he claimed, Sheffield ignored his request. T.J.W. testified that Sheffield never informed him that he had a constitutional right to testify, and T.J.W. denied that he himself made the decision not to testify after the State rested.

On cross-examination, T.J.W. admitted that he had been prescribed Viagra that "allowed [him] to have some limited performance." T.J.W. acknowledged that, if he had testified regarding his medical records, the State could have questioned him about the Viagra on cross-examination. (R. 45.)

Doc. No. 37-1 at 4–6 (page references from record on Rule 32 appeal).

In its order denying Whitehead's Rule 32 petition regarding his claim that Sheffield was ineffective for preventing him from testifying, the trial court found:

On March 16, 2015, the court conducted an evidentiary hearing on the defendant's claim that his trial attorney prevented him from testifying at trial in his own behalf against his wish…. All witnesses testified to numerous meetings to discuss the case, including tactics and strategy, and trial preparations. No one disputed that Mr. Sheffield was thoroughly prepared for trial and that his performance was in compliance with constitutional standards. Mr. Sheffield was chosen and retained by the defendant. All witnesses testified to numerous discussions about whether the defendant should testify or not at trial. The defendant's wife contradicted the defendant's argument by admitting that Mr. Sheffield told the defendant that it was his decision to testify. Mr. Sheffield also told the defendant that the defendant makes the final decision about whether to testify and that the defendant decided not to. Mr. Sheffield is an experienced criminal defense attorney and it was within his role as trial attorney to advise the defendant as to his professional opinion whether the client should testify or not. It is undisputed that Mr. Sheffield, after a thorough review of the facts and the posture of the trial at the time a decision had to be made, advised the defendant that it would hurt his case if he testified. However, it is clear from the evidence that the defendant was properly advised and that he alone made the final decision not to testify at trial.

Doc. No. 39-2 at 93.

Applying the standard for assessing claims of ineffective assistance of counsel set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), the Alabama Court of

Criminal Appeals affirmed the trial court's judgment, finding that Sheffield did not interfere with Whitehead's right to testify and that Sheffield's performance was professionally reasonable:

> The record shows that T.J.W. [Whitehead] was aware that he had the right to testify in his own behalf and that he had the right not to testify. R.W. [Whitehead's wife] testified that T.J.W.'s counsel informed T.J.W. that it was ultimately his decision whether to testify at trial. T.J.W.'s trial counsel spoke with T.J.W. on numerous occasions during trial preparations and at least twice during T.J.W.'s trial regarding T.J.W.'s desire to testify or not to testify. T.J.W.'s trial counsel testified that T.J.W. ultimately decided not to testify. The record does not indicate that T.J.W.'s trial counsel interfered with T.J.W.'s right to testify in his own behalf. Therefore, we cannot say that T.J.W.'s trial counsel was deficient in this respect. Accordingly, T.J.W. is not entitled to relief on this issue.

Doc. No. 37-1 at 12.

Because the state court ruled on the merits of Whitehead's ineffective assistance claim, this court's § 2254 review under *Strickland* is another step removed from the original analysis, or as the Supreme Court puts it, "doubly deferential." *Burt v. Titlow*, __ U.S. __, __, 134 S.Ct. 10, 13 (2013) (quotation marks and citation omitted); *see also Tanzi v. Sec'y, Florida Dep't of Corr.*, 772 F.3d 644, 652 (11th Cir. 2014) (quoting *Burt*).

A criminal defendant has a fundamental constitutional right to testify on his own behalf at trial. *Rock v. Arkansas*, 483 U.S. 44, 49–52 (1987); *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992). Thus, every criminal defendant is privileged to testify in his own defense or refuse to do so. *Faretta v. California*, 422 U.S. 806, 834 n. 45 (1975). Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and the fact that it is ultimately for the defendant himself to decide. *Teague*, 953 F.2d at 1533. Because the burden of ensuring that a criminal defendant is informed of the nature and existence of the right to testify rests upon trial counsel, it is, therefore, a component of effective assistance of counsel. *Id.; Sexton v. French*, 163 F.3d 874, 882 (4th Cir. 1998).

Here, the state court credited testimony indicating that Sheffield fully advised Whitehead regarding his right to testify and the attendant strategic implications, and that Sheffield advised Whitehead that whether to testify or not was a matter for Whitehead himself to decide. The state court's credibility determinations did not constitute an unreasonable determination of the facts in light of the evidence under 28 U.S.C. § 2254(d)(2).  Sheffield's testimony established that he told Whitehead he believed his best chance for an acquittal was to testify at trial, particularly to provide a logical explanation for the love letter Whitehead sent to the victim. It also established that Sheffield expressed serious concerns to Whitehead during pretrial preparations that Whitehead was not coming up with an explanation a jury was likely to view favorably. Sheffield's testimony also indicated that the final decision not to testify was made by Whitehead at trial, after the State rested, when Whitehead told Sheffield he did not want to testify because he thought the case "was going good."

Nor did the state courts act contrary to, or unreasonably apply, clearly established federal law as determined by the Supreme Court in concluding that Sheffield met his obligation to inform Whitehead of the nature and existence of his right to testify, while allowing Whitehead to make the final decision whether to testify.  *See* 28 U.S.C. § 2254(d)(2). Because Whitehead has failed to meet the first prong of the *Strickland* standard, which requires that he demonstrate deficient performance by his counsel, he is not entitled to relief based on this claim of counsel's alleged ineffective assistance.

### 2.   *Failure to Present Exculpatory Evidence and Call Alibi Witnesses*

In claims involving connected factual and legal issues, Whitehead contends that Sheffield rendered ineffective of counsel by (i) failing to introduce exculpatory evidence crucial to his defense, and (ii) failing to call, secure, or subpoena witnesses available to provide alibi testimony.

*See* Doc. No. 22 at 7–8; Doc. No. 23 at 4 and 11; Doc. No. 34 at 2–3 and 8–10. In this regard, Whitehead argues that Sheffield was ineffective for failing to introduce his Veterans Administration ("VA") medical records[5] showing he suffered from erectile dysfunction during the time his crimes allegedly occurred and, due to his condition, could not have committed the offense of rape, which includes sexual intercourse as an element. Doc. No. 23 at 4–10; Doc. No. 34 at 8–10. Whitehead maintains that evidence of his erectile dysfunction would have demonstrated his innocence of the rape charges and impeached R.R.'s testimony regarding all charges against him. Doc. No. 34 at 8–9. Whitehead also argues that Sheffield was ineffective for failing to present testimony from his wife, Regina, whom he says would have confirmed he suffered from erectile dysfunction during the relevant time. *Id.* at 8. In addition, Whitehead maintains that Regina would have testified that Whitehead was not home, but instead was at work, on the day the family moved into a new house—a day, according to R.R., on which Whitehead committed a rape against her at the house. *Id.* at 9. Whitehead contends that such testimony from Regina would have rebutted R.R.'s testimony on the particular rape charge and would also have impeached R.R.'s testimony on her other claims. *Id.* Whitehead further maintains that Regina and another potential witness could have testified that they knew of a plan between R.R. and a twenty-four-year-old man to get Whitehead "out of the way" because Whitehead was an obstacle to an alleged romantic relationship between R.R. and the man. *Id.* at 9. Whitehead argues that such testimony would have evidenced a motive for R.R. to make false claims against him. *Id.* at 10.

In denying relief on Whitehead's Rule 32 claims that Sheffield was ineffective for failing to call Whitehead's wife Regina to testify and for failing to introduce Whitehead's VA medical records, the trial court found:

---

[5] Whitehead received a medical discharge from the United States Navy in 1992. His VA medical records reflect that he suffers from various health problems related to diabetes.

1. The defendant alleges ineffective assistance of counsel by his trial attorney [for] not calling his wife as a witness. The wife has submitted an affidavit in which she details the defendant's sexual dysfunction as well as some other ancillary issues. None of the issues she outlines establish the defendant's innocence. It is within a trial attorney's strategic and tactical decision-making authority to decide witnesses to call or not call. *Johnson v. State*, WL 2812234 (Ala. Crim. App. 2007).

2. The defendant claims his attorney was ineffective for failure to introduce medical evidence of his erectile dysfunction. He has attached copies of his VA medical records to his "brief." The records indicate the medical diagnosis but contradict his claim that he was physically incapable of sexual intercourse.

Doc. No. 39-1 at 29.

### a. Medical records

Whitehead's VA medical records attached to his Rule 32 petition were generated between 2003 and 2011 and reflect that Whitehead suffers from diabetes mellitus and related neuropathic and cardiovascular problems. Doc. No. 39-1 at 133-76. In addition, the medical records reflect that, at least since 2003, Whitehead had been diagnosed with erectile dysfunction. While the medical records note Whitehead's erectile dysfunction, they do not indicate that, because of the condition, Whitehead was completely unable to have an erection or that he could not have an erection during the period of time when his crimes allegedly occurred. (R.R.'s testimony indicated that the incidents when Whitehead raped her occurred between 2008 and 2010.) Nor does it appear that the diagnosis of erectile dysfunction reflected in the medical records precludes Whitehead from penetrating the victim's vagina and thus committing rape. The medical records reflect that, at least through some point in 2005, Whitehead had been prescribed and was taking Viagra, and was engaging in sexual intercourse (Doc. No. 39-1 at 162), although Whitehead states that he stopped taking the drug in 2005 because it had harmful side effects related to his other health problems. Thus, the medical records reflect that Whitehead was capable of sexual intercourse even after receiving the diagnosis of erectile dysfunction. Accordingly, the fact that Whitehead

had been diagnosed with erectile dysfunction does not, in itself, show that he was incapable of sexual intercourse (i.e., penetration) at all times during the period when the alleged offenses took place and falls far short of demonstrating his innocence of the charge of rape.

The record reflects that Sheffield sought to introduce Whitehead's VA medical records at trial, but that he could not obtain the presence of the VA's custodian of records, without whom the trial court would not allow the records to be admitted. Doc. No. 14-4 at 136–51. Sheffield maintained that the previous district attorney had agreed not to object to admission of the medical records despite the unavailability of the custodian of records; however, the prosecutor who tried the case argued to the court that there was no such agreement. *Id*. at 139–46. The trial court stated that Whitehead could testify about the matters indicated in his medical records. *Id*. at 151. The possibility of Whitehead's testifying about these matters himself was lost, however, when Whitehead later chose not to testify after the State rested its case.

Because Whitehead's VA medical records would have been inconclusive on the question of Whitehead's ability to engage in sexual intercourse, and would not have ruled out his ability to commit the offense of rape, the court finds, upon consideration of the totality of the evidence before the jury, that there is not a reasonable probability the outcome of the trial would have been different had the medical records been admitted in evidence. Thus, Whitehead fails to demonstrate prejudice as required by *Strickland*. Further, in light of the circumstances surrounding the non-admission of the medical records and Whitehead's own decision not to take the stand and testify, which foreclosed Sheffield's ability to introduce evidence about the matters indicated in the medical records through testimony by Whitehead, this court cannot say that Whitehead demonstrates deficient performance by Sheffield under the *Strickland* standard. Because Whitehead fails to satisfy the *Strickland* standard for claims of ineffective assistance of counsel,

the state court decision denying relief on this claim was not an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d)(1) and (2). Whitehead is not entitled to habeas relief based on this claim.

### b. Failure to call Whitehead's wife as witness

While the affidavit from Whitehead's wife Regina, which Whitehead included with his Rule 32 petition, indicates that Regina was willing to provide testimony at trial confirming that Whitehead suffered from erectile dysfunction (*see* Doc. No. 39-1 at 128-29), Regina's averments in her affidavit would be less valuable to Whitehead's defense than they may at first seem. In her affidavit, Regina states that "by the time [she and Whitehead] moved to Alabama in 1999, [Whitehead] was no longer able to attain an erection at all." Doc. No. 39-1 at 128–29. While she then refers to the VA's "[taking] over [Whitehead's] medical care in 2003," and describes the VA's diagnosis of the medical causes of Whitehead's condition, she makes no specific statement about the nature of Whitehead's erectile dysfunction after 1999, saying only that she "knows" it would have been "physically impossible" for Whitehead to have had sexual intercourse with the victim, R.R. *Id.* However, as already noted, the VA medical records and other exhibits attached to Whitehead's Rule 32 petition—and statements by Whitehead himself—establish that Whitehead was engaging in sexual intercourse at least until 2005. Indeed, attached as an exhibit to Whitehead's Rule 32 petition is another affidavit by Regina, submitted to support a medical claim Whitehead made to the VA in April 2005, in which Regina indicates that Whitehead was capable of engaging in sexual intercourse around that time. Doc. No. 39-1 at 121. Thus, Regina's statement in her first affidavit that Whitehead could no longer attain an erection by the time she and Whitehead moved to Alabama in 1999 is misleading or at least capable of being impeached by the second affidavit. In the end, it is not clear Regina could have testified that Whitehead was unable

to engage in sexual intercourse at all times relevant to the charges against him or that she could have provided credible testimony denying Whitehead's ability to commit the offense of rape. After considering the totality of the evidence before the jury, the court is convinced there is not a reasonable probability that the outcome of the trial would have been different had Regina testified in conformity with the statements in her affidavit.

As for Regina's contention she would have testified that Whitehead was not present on the day R.R. maintained she was raped by Whitehead at the house into which the family had moved on that day (*see* Doc. No. 39-1 at 131),[6] the court finds, after considering the totality of the evidence before the jury, such testimony was unlikely to have affected the jury's verdict.[7] Regina's credibility at trial would have been questionable, considering ample evidence indicating that she had taken actions adverse to R.R.'s interests, and her affidavit also concerns an event alleged to have occurred on a single day more than six years before the affidavit was executed. Moreover, Sheffield cross-examined R.R. vigorously about the incident, attempting to point out inconsistencies in R.R.'s account. *See* Doc. No. 14-3 at 95–98, 112–14, 185–86. Finally, the substantial evidence against Whitehead, in addition to the factors mentioned above, convinces this court there is not a reasonable probability that the outcome of the trial would have been different if Regina had testified in conformity with her affidavit.

Regarding Whitehead's assertion that Regina and another potential witness could have testified they knew of a plan between R.R. and a twenty-four-year-old man to get Whitehead "out

---

[6] There is no indication in the record that Sheffield had been informed Regina would give testimony to this effect.

[7] In her testimony, R.R. maintained the rape occurred while Regina and R.R.'s siblings were retrieving items from the family's old house to be moved to the new house. Doc. No. 14-3 at 4–5. In her affidavit, Regina indicates that she and the girls moved all items from house to house on that date but that Whitehead was at work. Doc. No. 39-1 at 131

of the way" because Whitehead was an obstacle to an alleged romantic relationship between R.R. and the man, Regina's affidavit reveals that any testimony Regina may have sought to provide on this matter would have been inadmissible hearsay. *See* Doc. No. 39-1 at 130. Whitehead's Rule 32 petition included no affidavit from the other potential witness, who, according to Regina, told Regina he overheard R.R. and the twenty-four-year-old man discussing the alleged plot against Whitehead. *Id.* "[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." *United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted). Complaints about uncalled witnesses are disfavored. *Sanders v. United States*, 314 F. App'x 212, 213 (11th Cir. 2008). "This is especially true because allegations of what a witness would have testified are largely speculative. Speculation about what witnesses could have said is not enough to establish the prejudice-prong of *Strickland*." *Jones v. McNeil*, No. 07-22367-CIV, 2009 WL 1758740, at *6 (S.D. Fla. Jun. 22, 2009). Moreover, the trial record reflects that, through questioning of several witnesses who testified, Sheffield presented to the jury the same defense theory Whitehead says Regina and the uncalled witness would have testified to – i.e., that R.R. fabricated her allegations against Whitehead to remove him as an obstacle to her alleged romantic relationship with the twenty-four-year-old man.

For the reasons indicated above, the court finds that Whitehead fails to satisfy the *Strickland* standard for claims of ineffective assistance of counsel. The state court decision denying relief on Whitehead's claim that Sheffield was ineffective for failing to present testimony from Regina was not an unreasonable application of clearly established federal law or an

unreasonable determination of the facts in light of the evidence.  *See* 28 U.S.C. § 2254(d)(1) and (2). Whitehead is not entitled to habeas relief based on this claim.

### 3.  *Failure to Object to Trial Court's "Ex Parte Communications" with Jury*

Whitehead alleges that Sheffield was ineffective for failing to object to the trial court's *ex parte* communications with the jury during its deliberations by providing the jury with supplemental instructions outside the presence of the parties and the court reporter.  *See* Doc. No. 22 at 7–8; Doc. No. 23 at 6 and 11; Doc. No. 34 at 2–3.

The only indication of contact between the trial court and jurors after presentation of the evidence and the trial court's jury charge is evidence indicating that the court told jurors, once they convened to the jury room to begin deliberations, that they could use their trial notes during their deliberations. Doc. No. 14-5 at 181–82.  In denying relief on this claim in Whitehead's Rule 32 petition, the trial court found:

> The defendant alleges ineffective assistance of counsel by his trial attorney [for] not objecting to the court telling the jury in the jury room that they could takes notes. There is nothing improper about this. The court notes that the undersigned also serves as the bailiff with the jury, as bailiffs are not provided for by the state.

Doc. No. 39-1 at 29.

Whitehead demonstrates no impropriety in the trial court's actions and fails to show how he was prejudiced by the trial court's telling jurors they could use their notes during deliberations. Because he fails to demonstrate deficient performance by Sheffield in failing to object to the trial court's actions and can show no resulting prejudice, he does not satisfy the *Strickland* standard for claims of ineffective assistance of counsel. The state court decision denying relief on this claim was not an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence.  *See* 28 U.S.C. § 2254(d)(1) and (2). Whitehead is not entitled to habeas relief on this claim.

### *4.    Failure to Object to Trial Court's Failure to Rule on Objections*

Finally, Whitehead claims Sheffield was ineffective for failing to object to the trial court's failure to rule on numerous objections, made both by Sheffield and by the prosecutor, during the course of the trial. *See* Doc. No. 22 at 8; Doc. No. 23 at 6 and 11; Doc. No. 34 at 2–3. Here, Whitehead's Rule 32 petition did little more than set out a laundry list of instances during trial when counsel for the respective parties objected but the trial court did not expressly rule on the objection. Doc. No. 39-1 at 98–103. In most of the instances cited by Whitehead, counsel objected to a question posed by opposing counsel, whereupon opposing counsel withdrew the question and rephrased it in an unobjectionable manner or moved on to another question. The trial court denied relief on this claim in Whitehead's Rule petition, finding that Whitehead failed to demonstrate ineffective assistance by Sheffield. Doc. No. 39-1 at 29.

This court has reviewed the record and can conceive of no manner in which Whitehead was prejudiced by Sheffield's failure to secure rulings by the trial court on the matters objected to by counsel for the respective parties. Because Whitehead fails to satisfy the *Strickland* standard for claims of ineffective assistance of counsel, the state court decision denying relief on this claim was not an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d)(1) and (2). Whitehead is entitled to no relief on this claim.

## IV.    CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that the petition for writ of habeas corpus under 28 U.S.C. § 2254 be DENIED and this case DISMISSED with prejudice, as Whitehead's claims in the amendment to his petition do not entitle him to any relief.

The Clerk of the Court is DIRECTED to file the Recommendation of the Magistrate Judge and to serve a copy on the petitioner. The petitioner is DIRECTED to file any objections to this Recommendation on or before August 23, 2017. Any objections filed must specifically identify the factual findings and legal conclusions in the Magistrate Judge's Recommendation to which the petitioner objects. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc*., 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson,* 885 F.2d 790, 794 (11th Cir. 1989).

DONE, on this the 9th day of August, 2017.

/s/ Susan Russ Walker
Susan Russ Walker
United States Magistrate Judge